[Crim. No. 3495. First Dist., Div. One. Dec. 31, 1958.]

THE PEOPLE, Respondent, v. JAMES HOWARD, Appellant.

640

Nathan S. Smith, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

PETERS, P. J.—Defendant was charged and convicted of two first degree burglaries. From the judgment entered on this verdict he appeals.

The attorney general contends that this court lacks jurisdiction to consider the appeal because, so it is urged, the appeal was filed beyond the 10-day period permitted by rule 31 of the Rules on Appeal. That rule requires that, in

criminal cases, the notice of appeal must be filed within 10 days of the rendition of judgment. The period fixed by this rule is jurisdictional, and the appellate court has no power to relieve the defendant from his default in the event he files the notice beyond the period specified. (*People* v. *Lewis*, 219 Cal. 410 [27 P.2d 73]; *People* v. *Riser*, 47 Cal.2d 594 [305 P.2d 18]; *People* v. *Cato*, 136 Cal.App.2d 503 [289 P.2d 119].)

In the instant case, judgment was rendered October 18, 1957. The notice of appeal is dated October 27, 1957, but was not filed in the proper county clerk's office until October 29, 1957. Thus, on its face, the notice of appeal was filed one day too late.

 Although the appellate court is without power to relieve a defendant from his default in filing the notice beyond the 10-day period, it is now well settled that where a defendant is in custody, so that he has no personal access to the proper clerk's office, his notice of appeal will be deemed to have been constructively delivered within the prescribed time if he places the notice in the hands of the proper prison officials within such time that it can be mailed to the clerk's office and reach that office before the 10-day period has elapsed. (*People* v. *Slobodion*, 30 Cal.2d 362 [181 P.2d 868].)

 In an attempt to bring himself within this rule the defendant has filed affidavits with this court in which it is averred that, after the rendition of judgment on October 18, 1957, he was sent to the Reception Center at Vacaville, where he was received on October 21, 1957; that on October 23, 1957, he delivered a handwritten notice of appeal to the proper prison officials and was told that notices of appeal had to be typed before being placed in the mail;* that on October 25, 1957, this notice of appeal was returned to him with the statement that it could not be typed; that on October 27, 1957, he delivered another handwritten notice of appeal to the proper inmate clerk.

The Superintendent of Vacaville avers that the prison records show that defendant delivered his notice of appeal to the proper prison officials "on or before Monday, October 28, 1957," and that it was mailed on the 28th to the proper

---

*The Associate Superintendent of the Reception Center avers that the rules of the institution then in effect required that notices of appeal be typed before being mailed, and that typing work for the inmates was normally done at the typing pool staffed by inmate clerks.

clerk's office;† that the records of the prison do not show the precise date on which the notice was delivered to the prison officials, but that he has been informed by defendant that it was on the 27th, a Sunday; that under procedures then in effect at Vacaville such notices were normally processed and mailed the same day they were received by the prison officials if delivered on any week day; that because the facility operates with a reduced staff on Saturdays and Sundays, such notices were not processed on such days and, if received after 4:30 p. m. on Fridays, were not mailed until the next Monday. It is also averred that in October, 1957, the Reception Guidance Center was just being moved to Vacaville so that "procedures were not very well established."

It is our opinion that defendant has brought himself within the spirit of the rule of the Slobodion case. Under the most limited interpretation of the affidavits, it is apparent that the notice of appeal was properly delivered by defendant on October 27th. Had it been mailed that day it would have reached the county clerk's office in San Francisco on October 28th. Had this been done, the notice of appeal would have been filed in time. According to Howard's affidavit, which is not contradicted, he properly delivered a handwritten notice on October 23rd, was told that it had to be typed, and on the 25th was told that it could not be typed. There is, of course, no legal requirement that notices of appeal must be typed, and, in fact, the notice of appeal that was ultimately mailed was in handwriting. Had the notice of appeal been mailed on the 23rd or 24th, it would, obviously, have reached the clerk's office in San Francisco well before the 28th.

A prison must, of course, have rules and regulations governing the conduct of inmates. But such rules and regulations cannot be used to impair an inmate's important and constitutional right to appeal. ▆ In *People* v. *Tenney*, 162 Cal. App.2d 458, 459-460 [328 P.2d 254] (pet. for hearing denied) it was stated: "It is now well settled that, if the defendant is in custody, and makes a good faith effort to file the required notice within the statutory period, but is prevented from doing so by the acts of the prison authorities, the appeal will be considered as having been filed in time. ▆ The theory is that, if the notice of appeal is delivered to the prison officials within the statutory period with a request to mail it, such delivery is a constructive delivery to the appropriate county

†The notice of appeal, received in the clerk's office on October 29, was in handwriting, and had been mailed on the 28th, which was a Monday.

clerk, and the subsequent failure of the prison officials to prepare and mail the notice within time cannot adversely affect the rights of defendant.'' That case held that if the notice of appeal was delivered to the prison officials on the 9th day after rendition of judgment, mailing time between Vacaville and San Francisco being one day, it was filed in time. This principle was reaffirmed in *People* v. *Griffin,* 162 Cal. App.2d 712 [328 P.2d 502] (pet. for hearing denied).

The attorney general argues that these cases should be overruled. Attention is called to the fact that, according to the affidavits of the prison officials, the notice was delivered to them on October 27th, and, although if then mailed it would have been received in time on the 28th, the 27th was a Sunday, and, under prison procedures, no mail is processed if received after 4:30 p. m. on Friday, until the following Monday. Thus, so it is urged, the defendant was negligent in not delivering his notice before 4:30 p. m. on Friday, October 25th, and the delay was chargeable to him and not to the prison officials. Aside from the fact that defendant avers that he first delivered the notice for mailing on October 23rd, and assuming that it was not delivered for mailing until Sunday the 27th, the argument of respondent misinterprets the basic theory of the Slobodion case, and of those cases following it. Those cases recognize that a person in custody is hampered in protecting his legal and constitutional rights. As long as he acts promptly and the delay in mailing is not his fault, the notice will be deemed to have been constructively delivered. The rule is not predicated upon a showing that the prison officials were fraudulent or negligent in not mailing the notice sooner. As long as the defendant has not caused the delay and has acted within time, the notice will be deemed to have been constructively delivered whatever was the cause of the delay. However reasonable it may be to adopt a rule that notices of appeal must be typed, or a rule that no mail will be processed from Friday after 4:30 p. m. until Monday, such rules cannot be used to cut down the defendant's very limited time in which to appeal. As long as he acts promptly and in time, the prison rules cannot be used to deprive the defendant of his constitutional right of appeal. Thus, the rule of the Tenney and Griffin cases is sound and is reaffirmed. Under that rule the notice of appeal here involved was filed in time.

We turn to a consideration of the appeal on its merits. On the evening of July 12, 1957, the home of the Wolfsohns on

Florence Street in San Francisco was burglarized. Among the property taken, most of which was subsequently found in the possession of defendant and identified by the Wolfsohns or others, were certain cultured pearls, a matching cigarette case and compact, gold earrings, a suit of clothes and a dress.

On the evening of July 19, 1957, or the early morning hours of July 20th, the apartment of the Bernsteins on Montgomery Street in San Francisco was burglarized. Among the property taken, all of which was subsequently found in the possession of defendant and identified by the Bernsteins, was a grey cabinet containing a strong box filled with papers, and a woman's raincoat. The Bernsteins also identified a tan corduroy jacket found by them in their apartment after the burglary and which did not belong to them.

There were no eyewitnesses to the above crimes. No one saw defendant make the unlawful entries, nor did anyone see him near or about the burglarized premises on the nights in question. The evidence first connecting defendant with these crimes came from one Marlene, a 21-year-old married woman, who had been living with defendant as his mistress for some time prior to the burglaries. She testified that on the evening of July 12, 1957, defendant, accompanied by a man named Paul, came to the apartment she occupied with defendant sometime between 10 and 11 p. m.; that they were then carrying certain items of property which they proceeded to divide; that among the property were the matching compact and cigarette case, the pearls, the gold earrings and the dress, all later identified by the Wolfsohns. Marlene also stated that defendant had the suit stolen from the Wolfsohns and identified by them, which defendant took to a tailor for alterations and from whom it was later recovered.

Marlene also testified that around 5 a. m. of July 20, 1957, defendant returned to their apartment carrying a grey cabinet wrapped in a woman's raincoat. These items were later identified by the Bernsteins as articles stolen from their apartment. Marlene also testified that defendant then told her he had stolen the property "up on Telegraph Hill" from a house where he had seen a boy sleeping with the covers over his face and where the occupants must have had a party because the place was messed up. Mrs. Bernstein testified that her son frequently slept with the covers over his head, and that on July 19, 1957, there had been a wedding and reception at their home.

Marlene also testified that defendant searched the grey

cabinet, and, finding that the strong box it contained had nothing of value in it, grew angry and stated that he was going to return to the apartment where he had gotten it in order to pick up a purse he had seen there; that he then left and later returned without his coat, telling Marlene that his coat caught in a door and that he had left it there. Marlene identified the tan corduroy coat found by the Bernsteins as the coat defendant was wearing that night. The coat was also identified as belonging to defendant by several independent witnesses.

Marlene also testified that about two weeks after defendant was arrested he telephoned to her. Marlene was then staying at the home of her father. Her father listened in on the conversation. Marlene testified that the conversation was as follows: ''He said, 'Why do you want to do this to me?'... He said—He says, 'Don't you know I can get five to life for this?' And I said, 'Well, you did it.' And he said: 'Sure, I did it.' And he said, 'Did you go before the Grand Jury last night?' I said, 'I did.' And he said, 'Well, don't you know I am out on bail and,' he said, 'I'm going to kill you.' ''

The father of Marlene, who had answered the telephone and then listened in on the same phone while defendant was talking, testified that he heard the conversation and that he had taken notes of it. Using the notes to refresh his recollection, he recounted the conversation as follows: ''Well, this is what he said. He said, 'Why do you want to do this to me? Don't you know I can get five to life?' 'Well, you know,'—this is what she said—'Well, you know you did it.' He said, 'Sure, I did,' and, he said, 'Don't you know I'm out on bail and you better not come out of the house, because I'm going to kill you.' ''

A police officer at the city hall testified that at the time in question he had permitted defendant to make a telephone call and saw him do it, but did not hear the conversation. Defendant, on cross-examination, admitted telephoning to Marlene on the day in question, admitted some of the conversation as testified to by Marlene and her father, but denied admitting that he had committed the crimes, and denied making the threat to kill Marlene.

The police found defendant in possession of the stolen property and arrested him as the result of Marlene coming to them and complaining about how defendant had treated her. She testified that she had lived with defendant since May of 1957; that she grew to dislike the relationship because she did

not like the idea of defendant having committed the crimes here involved, and because defendant refused to "let her go" and "kept beating her." Defendant also, she said, had committed sodomy upon her. Defendant kept insisting that she become a prostitute. At first she refused, but finally consented on condition he let her go out alone for a few hours. Defendant agreed. Marlene then voluntarily came to the police department and reported some of the facts to Officer Marionetti. On cross-examination of this officer by the defense, the following occurred, the first question being by defense counsel: "Q. Am I——And as I understand it, you handled the complaint of Mrs. Garcia. Well, isn't it true that the only thing she told you at the Central Station was that she had been living with Howard; that they had a quarrel; that he wouldn't let her into the—let her in to get her things and she merely wanted some officer to go with her and get her own things and move them out of the place? A. Oh, no, she told me a lot more than that. Q. Well, what did she tell you? A. Well, she told me that the man had forced his attentions on her that particular night. MISS SCHNACKE [The Prosecuting Attorney]: Would you describe——You used a rather delicate phrase, officer. Relate what she told you the Defendant had done to her. THE WITNESS: Well, she told me the Defendant had committed an immoral act, sodomy was one, and when we arrived at the scene there was blood on the mattress and everything. And she stated the man had struck her and blacked her—hit her about the face. MR. McNAMARA: Q. Now, these things were mentioned at the Central Police Station, Officer? A. Yes, they were. Q. Well, did she tell you she had been living with the man for several weeks? A. Yes, she told me longer than that. She stated——Q. Well, you went there, then, I take it, to give her some protection and to allow her to get her personal things, is that right? A. No, not necessarily. She also revealed the man had committed burglaries. She didn't know where. She didn't give the exact places, but she stated it was in the Telegraph Hill area and Nob Hill area. Received stolen property——He had stolen property, rather, on the premises."

On redirect, this officer testified that, from his observation, Marlene appeared to have been beaten.

After the officer had been told that defendant had beaten Marlene, had tried to force her into prostitution, had committed sodomy on her person, had committed robberies and that some of the stolen property was in their apartment, and

after Marlene had asked for protection while she removed her possessions from the apartment, Officer Marionetti and another officer accompanied her to the apartment she occupied with defendant. Upon arrival Marlene attempted to open the door with her key, but the door was apparently bolted on the inside. Marlene then found an open window through which she climbed. She then let the officers in the front door, which she opened. Officer Marionetti observed, in the front part of the apartment, the grey cabinet stolen from the Bernsteins. The officers then searched the apartment and found other stolen property and also found the defendant who was hiding in one of the rear rooms. Defendant told the officers a story about just having disposed of some narcotics. After questioning the defendant, and after finding some of the property stolen from the two homes here involved, defendant was arrested and booked on suspicion of burglary.

Defendant, at the trial, denied any connection with either of the crimes. He admitted that he had been living with Marlene, and testified that on July 12, 1957, he and Marlene were out together until after midnight, but he could not remember where. He denied seeing a man by the name of ''Paul'' that night, and denied knowing such a person. He testified that some of the stolen property belonged to Marlene and that some of the rest of it he had either purchased from a man named ''Les,'' or ''Les'' had left it in the apartment. He denied that he had ever possessed the tan corduroy coat found at the Bernsteins. He denied most of the telephone conversation testified to by Marlene and her father. On cross-examination he admitted having committed the unnatural sex acts of which Marlene complained, testifying that she had consented thereto.

No attack is made on the sufficiency of the evidence. The appellant first complains that the prosecutor committed prejudicial error in questioning him about a prior felony conviction. The examination on this point was as follows: ''Q. Incidentally, you have been previously convicted of a felony, haven't you, Mr. Howard? A. Have I? Q. Haven't you? I am asking you. A. No. Q. No? Weren't you, in 1953, convicted of forging a government check? A. That was no felony. I was a minor during that time. Q. In 1953? You were born in 1934, weren't you? A. Correct. Q. And 1953, you would have been 19? A. No, I had just —— Q. Or, 18, going on 19—— A. During that time, when that check was cashed—— THE COURT: Wait a minute, wait a minute. Wait

until the question is finished. MISS SCHNACKE: Q. You were 18, going on 19, weren't you, in June of '53? A. Correct. Q. And you went to a Federal prison at El Reno, Oklahoma, is that correct? A. Correct. Q. For the crime? A. Correct. Q. And you did 18 months there? A. But, not for forgery. Q. Well, it was a felony conviction, wasn't it? A. Well, time when the check was cashed, I was 17 years old. Q. At that time, you were convicted and you were 18 and you did go to a Federal prison and do 18 months, which I think even Mr. McNamara will stipulate was a felony. Isn't that right? A. To my knowledge, I don't know it was a felony.''

No objection was made at the trial to these questions, but it now is contended that once the defendant denied committing a felony the only way he could be impeached was by the introduction of the record of his conviction. The point is without merit. Under section 2051 of the Code of Civil Procedure the defendant may be impeached by showing that he has been convicted of a felony by ''examination of the witness, or the record of the judgment.'' Thus the section recognizes that the defendant may be impeached by questions as well as by introduction of the record. ▆ In asking the questions the prosecutor should not inquire into the details and circumstances of the offense (*People* v. *Chin Hane,* 108 Cal. 597 [41 P. 697]; *People* v. *Darcy,* 101 Cal.App.2d 665 [226 P.2d 53]) nor should he constantly reiterate questions concerning the denied felony, but if the witness equivocates, the prosecutor may properly ask such questions as may be reasonably necessary to develop the fact of the conviction. (*People* v. *Chenault,* 74 Cal.App.2d 487 [169 P.2d 29].)

▆ The cross-examination here involved was well within permitted limits. The witness equivocated and bickered about his age. The further questions were necessary in order to show that the offense was ''punishable . . . for a term exceeding one year'' and so was a felony under federal law. (18 U.S.C.A. § 1.)

It should also be noted that the defense did not interpose an objection to the questions. Such an objection is normally required before the error can be raised on appeal (see cases collected 3 Cal.Jur.2d 634, § 156) unless it is so flagrant that prejudice necessarily resulted. (*People* v. *Wynn,* 44 Cal. App.2d 723 [112 P.2d 979].) Certainly, no such error appears here.

The next contention of defendant is that several references by the prosecuting attorney to defendant having committed

unnatural sexual acts with Marlene constituted prejudicial error.

As already pointed out, in cross-examining Officer Marionetti defense counsel pressed the witness for details of the conversation he had with Marlene when she first came to the police station. The officer replied that Marlene, among other things, told him that defendant had "forced his attentions on her." The prosecutor interrupted the examination and asked the witness to relate the facts as to what Marlene had stated defendant had done. Marionetti replied: "Well, she told me the Defendant had committed an immoral act, sodomy was one."

During the cross-examination of defendant, the prosecutor asked defendant if he had heard the officer testify of Marlene's complaints. The defendant stated that he had heard the testimony, whereupon the prosecutor asked: "Did you commit those acts?", to which defendant replied: "Yes, I did and if I am guilty of it, she is as guilty as I am."

Then in his opening argument to the jury the prosecutor made the following statement:

"He admitted committing improper sexual acts upon her. He seems to think it is all right, because his testimony was that that was all right with her. Maybe Mr. Howard doesn't know it, but he admitted the commission of a serious felony on the witness stand and he admits having done that, because the law provides it doesn't make any difference whether the person is a willing victim or not. You do not commit acts such as Mr. Howard was talking about and he knew what he was talking about, the act of sodomy she told the police officer about, either willing or unwilling victim.

"Mrs. Garcia told you that—The officer told you, rather, that Mrs. Garcia said she was an unwilling victim and that was her original complaint when she came down to complain to him about that. She told him about the stolen property. She told him about how he had been beating her up and he wouldn't let her out of the premises."

So far as the examination of Officer Marionetti is concerned there was certainly no error. It is settled law that where a conversation is inquired into it is not error to elicit the entire conversation even though, in this fashion, such conversation incidentally reveals the commission of another offense. (18 Cal.Jur.2d 585, § 137; *People* v. *Masters*, 133 Cal. App. 167 [23 P.2d 774].) It was the defendant's counsel who

first asked for this conversation and he, therefore, cannot complain that the full conversation was brought out.

As to the cross-examination of defendant, and the argument to the jury, a different problem is presented. It is clearly the law that evidence of the commission of prior, independent, unrelated offenses, having no tendency to prove any material fact in the prosecution's case, may not be admitted. (See cases collected 18 Cal.Jur.2d 583, § 136; *People v. Albertson*, 23 Cal.2d 550 [145 P.2d 7]; *People v. Channell*, 136 Cal.App.2d 99 [288 P.2d 326]; *People v. Baylor*, 47 Cal. App.2d 34 [117 P.2d 425].) However, the converse of the rule is also true, that is, "whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion." (*People v. Lyon*, 135 Cal.App.2d 558, 578 [288 P.2d 57].)

The evidence here involved falls within the exception. During the trial many articles of property were introduced into evidence. The prosecution contended that such articles had been stolen, and that they had been found in defendant's possession. The manner in which that property came into possession of the police was before the jury. The jury had been properly told that Marlene had complained to the police about defendant's conduct toward her, had told them of the alleged thefts, and had led the officers to the apartment she occupied with defendant, and admitted them. The officers found the property and arrested defendant. They had neither a search nor an arrest warrant. One of the reasons the police went to the apartment with Marlene was because she had complained of defendant's felonious sexual conduct toward her. Thus, this fact was relevant to explain the entry on the premises and defendant's subsequent arrest without warrants. Evidence to explain the arrest of the defendant and the circumstances surrounding it, even if other prior crimes are disclosed, is admissible. (*People v. Brite*, 9 Cal.2d 666 [72 P.2d 122]; *People v. Craig*, 152 Cal. 42 [91 P. 997].) Since the validity of the arrest and entry were relevant, the defendant's prior misconduct was also relevant. If relevant, the reference to it in the argument was also proper.

It should also be noted that defense counsel made no objections to any of this evidence, or to the argument. While this fact is not conclusive (*People v. Newson*, 37 Cal.2d 34 [230 P.2d 618]; *People v. Dabb*, 32 Cal.2d 491 [197 P.2d 1];

*People* v. *Hampton,* 47 Cal.2d 239 [302 P.2d 300]) it is worth noting on the issue of whether prejudicial error resulted.

The last major contention of defendant is that the items of property found in the apartment were not admissible in evidence because they were secured as a result of an illegal search and seizure, it being urged that Marlene had no legal right to admit the officers to the apartment.

It is, of course, the law that evidence secured in an illegal search is not admissible. (*People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) However, it is also the law that if the defendant or someone with apparent authority, consents to the entry, and the entry is made in good faith, it is not unlawful. Thus, defendant's mother can give consent to the entry (*People* v. *Michael,* 45 Cal.2d 751 [290 P.2d 852]); as can the owner of a house in which defendant rents a room (*People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469]; *People* v. *Caritativo,* 46 Cal.2d 68 [292 P.2d 513]); or the wife of defendant (*People* v. *Dominquez,* 144 Cal.App. 2d 63 [300 P.2d 194]). In *People* v. *Silva,* 140 Cal.App.2d 791 [295 P.2d 942], it was held that the brother of defendant's mistress, who lived at the house, could grant consent to an entry. Under these cases, anyone in joint occupancy of the house has authority to permit an entry without a warrant. In the present case, Marlene had told the officers that she was living at the premises with defendant and had been so living for several months. This is admitted by defendant. Marlene told the officers that defendant had beaten her, proposed that she enter a life of prostitution, committed a felonious act upon her, and had stolen property at the apartment. She asked protection while she removed her belongings. She led the officers to the apartment, and, after finding the front door bolted, climbed through the window and admitted the officers. There was no evidence that any duress was practiced upon her—in fact, it was at her insistence that the officers were there. Under such circumstances the entry was lawful. Once in the apartment some of the stolen property was in plain sight. This aroused the reasonable suspicions of the officers, a further search was made, and other property and the defendant were found. Thus, the search was legal. (*People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721].) The information from Marlene that defendant had committed a felony, the corroboration of part of her story from the bruises on her body, and the discovery of the stolen property in de-

fendant's apartment justified the arrest without a warrant. (*People* v. *Boyles*, 45 Cal.2d 652 [290 P.2d 535] ; *Willson* v. *Superior Court*, 46 Cal.2d 291 [294 P.2d 36].)

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 30, 1959, and appellant's petition for a hearing by the Supreme Court was denied February 25, 1959.