[Crim. No. 3694. First Dist., Div. Two. July 25, 1960.]

THE PEOPLE, Respondent, v. MELVIN HUGHES, JR., Appellant.

Charles J. Seifert, Jr., under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and Daniel A. Sharp, Deputy Attorneys General, for Respondent.

STONE, J. pro tem.*—Appellant Hughes and one Lashley were charged by an information filed by the district attorney of Santa Clara County with violating Penal Code, section 211 (armed robbery). They pleaded not guilty and were tried by a jury which found each defendant guilty of robbery, second degree. Defendant Hughes appeals from the ensuing judgment. A detailed recitation of the facts is necessary because appellant questions the sufficiency of the evidence connecting him with the commission of the crime as well as the evidence justifying reasonable cause for arrest and the concomitant search and seizure.

On March 13, 1959, between 4 and 8:30 p.m. a man identified as appellant by Mr. and Mrs. Thomas Mitchell, owners of "Club 4" and by Mrs. Carroll Cogger, a cocktail waitress, was at the Club drinking beer. He was wearing a light colored sport jacket and slacks. Defendant was accompanied by a man later identified as defendant Lashley. Between 9 and 9:30 one Winder parked his unlocked four-door 1949 Cadillac sedan outside the bar and restaurant about one block from "Club 4." In it he left some photographic equipment, which along with the car was missing when he left the establishment at 11 p.m. The automobile was recovered the following day but part of the photographic equipment was missing.

The same night about 11:30 p.m. a J. Darnell registered at the Palo Alto Town House Motel. He parked his car near the office, registered, and upon returning observed a black

*Assigned by Chairman of Judicial Council.

four-door 1949 or 1950 Cadillac pull into the motel parking area. It moved slowly into a parking space adjacent to him and because the motor was running and the headlights off, Darnell's curiosity was aroused and he remained in his car watching the Cadillac and its occupants for about 10 minutes. He observed two people, the driver, whom he described as hatless, dark-haired, with a long face and sharp features, was wearing a light colored jacket. The other person, also in the front seat, was described by Darnell as a short man, hatless, with light hair, a heavy roundish face, and wearing a dark leather jacket. Darnell left his car and entered his motel room but continued watching the men in the Cadillac from the window. He observed the man on the passenger side get out and walk forward from the car toward the motel office and disappear from view. The Cadillac backed into another parking space and then began moving slowly toward the motel office. Its headlights were never turned on.

Mr. and Mrs. G. E. Jones, the owners of the Palo Alto Town House Motel, testified that about 11:30 p.m. a young man entered the office and robbed them of $81 in $10, $5 and $1 denominations. They described him as a white man in his late teens, about 5 feet, 8 inches tall, weighing approximately 170 pounds. They testified that he was light complexioned, clean shaven, with sideburns slightly longer than normal. He had a fat round face, blue eyes and long, light colored hair. He was wearing dull black boots, dark blue heavy trousers, a dark brown or black waist-length leather jacket, light brown shirt but no hat. His left hand was entirely covered by a dark blue sock with a design in lighter color. As the man departed from the motel office the Joneses saw a dull black four-door 1949 or 1950 Cadillac sedan with a license bearing California plate colors speed out of the motel parking area. Mr. Jones saw the head and shoulders of two persons in the front seat. The only Cadillac Jones had registered that night was still in the parking area after the robbery. About 12 p.m. appellant Hughes again entered "Club 4" accompanied by the same man who had been with him in the same place between 4:30 and 5 p.m. that day.

James Owens, a Palo Alto cab driver, picked up a fare at the "Club 4" on the night of March 13 and took him to Mountain View. Later that night after the bars had closed the cab driver took the same man to an address on Colony Road, which was the residence of appellant. Owens later directed the police to this same address. Another cab driver

picked up a fare, who fitted the general description of the man who had robbed the Town House, at the intersection of Bayshore Highway and Mathilda Avenue about midnight on March 13 and took him to a place on the Santa Clara-Los Gatos highway to which he later directed the police. Shortly after midnight on March 14 Philip Morris, a deputy sheriff, stopped at the same intersection of Bayshore Highway and Mathilda Avenue and investigated a dirty black four-door 1949 Cadillac sedan parked on the shoulder of the road. It matched the description which Morris had received of a car seen during the robbery of the Town House. On the rear floor of the Cadillac the officer found a dark blue sock with a white diamond design. Officer Morris found the mate to the sock in front of appellant's dwelling to which cab driver Owens directed him. Morris together with Deputy Sheriff Richard G. Smith and Sergeant Best then approached the house. Sergeant Best knocked on the door and appellant's wife answered. The officer asked if ''Mel'' was at home and she replied that he was in bed. Best asked if the officers could enter and Mrs. Hughes answered ''yes.'' The officers went to the bedroom and although Morris shook Hughes' foot, he could not awaken him. The officers returned to the living room and questioned Mrs. Hughes about her husband's activities the afternoon and night before. She stated that he had left home early in the afternoon but that she did not know when he had returned. The officers asked if they might ''look around'' to which Mrs. Hughes replied ''yes.'' The officers found some photographic equipment in the Hughes' linen closet whereupon they returned to the bedroom and awakened Hughes. In answer to questioning he stated that he had been with his family that evening and that he had purchased the photographic equipment three or four days earlier. Subsequently he changed both of these statements. The officers also found a light colored jacket in the bedroom and $37 in Hughes' pocket in $10, $5 and $1 denominations.

About 6 a.m. deputy sheriffs went to the home of codefendant Lashley and were admitted by his mother. Lashley told them that he had spent the previous evening in Los Gatos. The officers observed a black leather jacket, a pair of blue Levi pants and black leather boots in his bedroom. Seven $5 bills were found on his person.

Later in the day Mr. and Mrs. Jones, the robbery victims identified Lashley from a lineup of about eight persons. They

also identified him at the trial. Darnell identified appellant and Lashley from photographs at the sheriff's office and again at the trial. Darnell testified that they were the occupants of the car he had seen at the Town House about 11:30 p.m. on March 13. He also testified that pictures of the abandoned Cadillac were of the same car that had pulled into the motel parking lot and that the jackets found at the home of appellant and of Lashley were the same garments he had seen the driver and the passenger wearing the night of the robbery. Mr. Winder testified that pictures of the abandoned Cadillac were of his automobile and that the photographic equipment found by the officers in Hughes' home was the same equipment he had left on the back seat of that car. Cab driver Owens testified that appellant was the man who had been his passenger and that the jacket found in appellant's home was the one he was wearing that night. Cab driver Whitney testified that Lashley was the man whom he had picked up at the intersection of Bayshore Highway and Mathilda Avenue and that the coat found in Lashley's home was similar to the one he was wearing at the time.

It would seem from the foregoing lengthy résumé of the evidence that it amply supports the jury verdict. Appellant contends it is insufficient because all of the evidence placing him with defendant Lashley at the scene of the robbery was circumstantial except the testimony of Darnell. He asserts that Darnell was impeached in several respects and perjured himself. It was shown that Darnell signed a signature card indicating two occupants of his room, yet he testified he was alone when he observed appellant and Lashley. He also gave a false address and an incorrect automobile license number when he registered. None of the impeachment pertained to a material point. His testimony describing appellant and Lashley, their acts and the car they were using was not discredited. When impeachment is not material to the main issue it goes merely to the credibility of the witness (*People* v. *Ashley,* 42 Cal.2d 246, 266 [267 P.2d 271]). It is elementary that the determination of the credibility of witnesses is the sole province of the trial court. The rule is stated thusly in *People* v. *McKinney,* 152 Cal.App.2d 332, page 335 [313 P.2d 163] : "A reviewing court may not reappraise the credibility of witnesses and reweigh evidence. (*People* v. *De Paula,* 43 Cal.2d 643, 649 [276 P.2d 600].) Claimed inconsistencies in the testimony of witnesses are matters which should be directed to the attention of the trier of fact, and

they cannot be urged on appeal. (*People* v. *Mercer,* 103 Cal. App.2d 462 [229 P.2d 411].)''

In similar vein appellant points out that Mr. and Mrs. Jones, the victims and only witnesses to the actual robbery, testified that defendant Lashley was armed with a shotgun, but that the jury returned a verdict of second degree robbery. This he argues proves that the jury did not believe their testimony and therefore voids all evidence of the corpus delicti. His conclusion is without substance. The jury could have believed all of the victims' testimony except that pertaining to the shotgun. The verdict indicates that this was the fact or that the jury decided to be lenient with appellant and his youthful codefendant. In *People* v. *Ashley, supra,* at page 266 the court said: ''It was for the jury to sift the true from the false, to determine the credibility of the witnesses and the weight to be given the testimony of an individual witness, even if it was inconsistent. (*People* v. *White,* 115 Cal.App.2d 828, 831 [253 P.2d 108]; *People* v. *Frankfort,* 114 Cal.App.2d 680, 700 [251 P.2d 401]; *People* v. *Moulton,* 71 Cal.App. 2d 195, 197 [162 P.2d 317].)'' An appellate court cannot reject the testimony of a witness unless it is obviously false or inherently improbable and to be improbable it must appear that what was related or described could not have occurred. (*People* v. *Dragoo,* 121 Cal.App.2d 322, 324 [263 P.2d 90].) Such is not the case here.

Appellant next contends that the court erred by overruling his objection to the admission into evidence of photographic equipment found in his home. The equipment had been taken from the Cadillac car identified as the one having been at the scene of the robbery. Appellant argues that since the officers had no search warrant the evidence was obtained illegally. The officers were permitted to enter appellant's home by his wife at a time when he was at home but in bed asleep. He argues that when the husband is at home, the wife has no authority to admit anyone without the husband's consent. Appellant relies upon *People* v. *Carter,* 48 Cal.2d 737 [312 P.2d 665]. In that case the wife admitted officers to the family home during her husband's absence and the court said at page 746:

''When the husband is absent from the home, it is the wife who controls the premises, the ordinary household property, the family automobile, and with her husband's tacit consent determines who shall and who shall not enter the house on business or pleasure and what property they may take away

114

with them. (*Cf. People* v. *Dominquez,* 144 Cal.App.2d 63, 65 [300 P.2d 194].) When the usual amicable relations exist between husband and wife (*cf. Kelley* v. *State,* 184 Tenn. 143 [197 S.W.2d 545, 546]), and the property seized is of a kind over which the wife normally exercises as much control as the husband, it is reasonable to conclude that she is in a position to consent to a search and seizure of property in their home. If Mrs. Carter freely consented to the removal of defendant's property, there was no unreasonable search or seizure.'' The precise question decided in *Carter* was the extent of the wife's authority to permit people to enter the family home in the absence of the husband. The implication that she has no such authority when the husband is at home is dicta. Nonetheless it would be persuasive if our case came squarely within the facts related by the dicta. A slightly different factual situation is presented here in that the husband, although at home, was asleep. Had the husband been unable to give consent because of incapacity such as illness, the influence of drugs or other disabling conditions, the wife of necessity would be the one to admit persons to the home. The question here is whether the fact that the husband was asleep and therefore not in control of the jointly owned property of the spouses vests authority in the wife to admit persons into the home. We think so. We take this position in view of the ''apparent authority'' principle enunciated by Supreme Court Justice Peters, who at a time when he was Presiding Justice of the First District Court of Appeal, wrote in *People* v. *Howard,* 166 Cal.App.2d 638, at page 651 [334 P.2d 105] :

 ''It is, of course, the law that evidence secured in an illegal search is not admissible. (*People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) However, it is also the law that if the defendant *or someone with apparent authority,* consents to the entry, and the entry is made in good faith, it is not unlawful. Thus, defendant's mother can give consent to the entry (*People* v. *Michael,* 45 Cal.2d 751 [290 P.2d 852]) ; as can the owner of a house in which defendant rents a room (*People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469] ; *People* v. *Caritativo,* 46 Cal.2d 68 [292 P.2d 513]) ; or the wife of defendant (*People* v. *Dominquez,* 144 Cal.App.2d 63 [300 P.2d 194]). In *People* v. *Silva,* 140 Cal.App.2d 791 [295 P.2d 942], it was held that the brother of defendant's mistress, who lived at the house, could grant consent to an entry. Under these cases, anyone in joint occupancy of the house has authority to permit an entry without a warrant. In the present

case, Marlene had told the officers that she was living at the premises with defendant and had been so living for several months.'' (Emphasis added.) It is to be noted that in Howard the defendant was in his home but that his mistress was not. She entered the house through a window and then admitted the officers through a door. They found the defendant inside and arrested him. The court held the entry and search to be legal. Howard was decided subsequent to *People* v. *Carter, supra*, and the Supreme Court denied a hearing February 25, 1959.

Aside from the authority of appellant's wife to consent, the search was legal if made pursuant to a lawful arrest. A peace officer may make an arrest without a warrant pursuant to Penal Code, section 836, subdivision 3, which reads : ''Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed.'' Reasonable cause has been defined as such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] and cases cited therein.)

Before entering appellant's home and arresting him, the officers interviewed Darnell who had described appellant and his codefendant and the car they were driving at the time and place of the robbery. Mr. and Mrs. Jones, the victims, had described the codefendant in whose company appellant had been seen before and after the robbery according to other statements made to the officers. They had knowledge that a Cadillac similar to the one used in the robbery had been stolen from a bar near the one where appellant had been drinking; in the back of the Cadillac they found a sock fitting the general description of the one the robber wore over his left hand and a matching sock in the front of appellant's home. The two taxi drivers had also been interviewed and one of them led the officers to appellant's residence. All of these facts known to the officers before the arrest support a strong suspicion on the part of a reasonable man that appellant had participated in the crime which the officers were investigating. The fact that the search of appellant's home and closet occurred before the actual arrest is immaterial (*People* v. *Simon,* 45 Cal.2d 645, 648 [290 P.2d 531] ; *People* v. *Ingle, supra,* 53 Cal.2d 407, 412).

Appellant also assigns as error a remark made by the judge at the outset of the trial. During *voir dire* examination of the jurors the judge made a brief statement of the nature of the case about to be tried so that the jurors could more intelligently answer the questions to be put to them. Appellant alleges that in the course of the statement concerning the nature of the charge the court said that Lashley (appellant's codefendant) was the one with the gun. This statement does not appear in the record. Counsel for appellant in his brief says that the court made such a statement and that he called it to the court's attention. That counsel made such complaint to the trial judge is evident from the record which reflects the following:

"Ladies and gentlemen of the Jury, before the Clerk reads the Information to you and states the plea of the Defendants, I just want to make this one statement. It was called to my attention that I may have stated on *voir dire* examination that the defendant Lashley was the one who had the weapon. If I did make that statement, I should have said it was alleged that the Defendant Lashley had the weapon because, of course, the Information is just an allegation which, as you know, you are not to take into consideration at all. All of the material allegations of the Information have to be proved by the People, so I want to make that correction in case I was in error." If there was any error committed by the court in making the statement prior to *voir dire* examination of the jurors, it was cured by the foregoing statement made immediately after the jury was sworn but before the information had been read or the opening statements made by counsel.

The judgment is affirmed.

Kaufman, P. J., and Draper, J., concurred.