[Crim. No. 7917. Second Dist., Div. Three. Dec. 6, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ANTONIO
PEREZ ORTIZ et al., Defendants and Appellants.

Paul Augustine, Jr., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Louis L. Selby, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—In the first count of an information the defendants Ortiz, Rosales and Padilla were accused of selling heroin on or about March 11, 1961, in violation of section 11501 of the Health and Safety Code. In the second count Ortiz alone was charged with such a sale which was alleged to have occurred on or about March 13, 1961. All of the defendants were accused in the third count of having made such a sale on or about March 17, 1961. Rosales was charged in the fourth count with a violation of section 12021 of the Penal Code in that on or about March 17, 1961, he, being a person theretofore convicted of a felony, had in his possession and under his custody and control a .45 caliber Colt automatic which was capable of being concealed upon the person, the firearm having a barrel less than 12 inches in length.

In a trial in which each defendant waived his right to trial by jury, Ortiz was found guilty as charged in each of the first three counts, Rosales was found guilty of the offenses charged in the third and fourth counts and acquitted with respect to the first count, and Padilla was found guilty as charged in the third count and acquitted of the charge contained in the first count. Ortiz has appealed from the judgment. Each of the other defendants has appealed from the judgment against him and from the order denying his motion for a new trial.

In considering the sufficiency of the evidence to support a conviction, the duty of an appellate court is to determine whether there is substantial evidence in the record, either direct or indirect, contradicted or uncontradicted, which justifies the conclusion reached. (*People* v. *Moore,* 196 Cal. App.2d 91, 96 [16 Cal.Rptr. 294].) Viewing the record in the light most favorable to the People (see *People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]), there was evidence of the facts hereinafter related.

Agent Velasquez of the State Bureau of Narcotic Enforcement met the defendant Ortiz in a bar on March 10, 1961. Ortiz said that the price of heroin was $200 an ounce. A meeting was arranged for the next day. On March 11, about 10 o'clock in the morning Agent Velasquez and Ortiz met in East Los Angeles. Ortiz walked to the intersection and to

a telephone booth and then went out of the officer's sight. After returning and talking to one Rodriquez, who had accompanied the officer on both occasions, Ortiz again walked toward the intersection and disappeared from view. When Ortiz returned he said, "Everything is ready. Give me the money and I'll tell you where to go." Agent Velasquez gave $200 to Ortiz. Ortiz then directed him to a service station at the intersection of Slauson and Pacific and told him that the "stuff" would be underneath the wash basin in the men's lavatory. The officer followed Ortiz's automobile to that location and found in the place indicated a rubber container wrapped in two paper towels. There was scotch tape on the container. In the container was a powdery substance which was later determined by analysis to be heroin. Agent Velasquez then talked to Ortiz, who was waiting nearby in his parked car, and arranged for a meeting at noon on the following Monday near the intersection of Studebaker Road and Firestone in Norwalk.

On Monday, March 13, 1961, Agent Velasquez met Ortiz at the appointed place, but Ortiz said he did not have any heroin and that they would have to meet that night between 5 and 8 p. m. in the parking lot of a market on Brooklyn Avenue. At about 5 :35 p. m. Ortiz drove into the parking lot in a car other than that which he had used on the prior occasions. It was a 1958 Chrysler bearing license number PMA273. The defendant Rosales was a passenger in the car. Ortiz left the car and met Agent Velasquez. Ortiz said everything was ready. The officer handed him $400 and was directed to a service station at Old River School Road and Florence where, he was told, two ounces would be underneath the wash basin of the men's lavatory. At the place indicated Agent Velasquez found two rubber containers wrapped in two paper towels. There was scotch tape around the ends of the containers and there was "a staple in the scotch tape and a staple on the end of one of the rubber" containers. The powdery substance in the containers was later determined by analysis to be heroin.

In the course of the conversation at the parking lot on March 13, Agent Velasquez and Ortiz arranged for further communication on Friday, March 17, 1961. As a result thereof they met on the latter date at the same place. Agent Velasquez entered Ortiz's automobile at about 7 :15 p. m. and they drove some distance away from the parking lot. The officer gave Ortiz $800 in currency, the serial numbers of which had been previously recorded by the Bureau of Narcotic Enforce-

ment. Ortiz told him to go to the service station at Old River School Road and Florence and that he would find four ounces underneath the wash basin. Agent Velasquez went to that location and found four rubber containers wrapped in two paper towels in the men's lavatory. In each container was a powdery substance which was later determined by analysis to be heroin. About 9 o'clock that night, Ortiz was arrested at his home. In the ensuing search no narcotics were found.

At about 10:30 p. m. on Friday, March 17, 1961, the defendants Rosales and Padilla were arrested at 11336 Studebaker Road in Norwalk. That house had been under surveillance since earlier in the evening. The Chrysler automobile which Ortiz had used on March 13 was driven to the house by a woman who alighted therefrom, accompanied by two children, and entered the residence. Three state agents went to the front door and knocked. They had no search warrant or warrant for the arrest of anyone. A woman came to the door. Agent Byram identified himself as a state narcotic agent, exhibited his credentials and inquired as to her identity. She said that she was Mrs. Alice Rosales. He asked if the house was her house and she replied that it was. Agent Byram further testified: ''I told her that we thought there might be narcotics or money concealed on the premises and asked for her permission to search. She readily admitted all of the agents, and we entered the front room at this time.'' The defendant Rosales, who was Mrs. Rosales' son, and the defendant Padilla, her nephew, were present, as was the woman who had previously entered with the children. Mrs. Rosales asked that they search the bedroom first so as not to disturb the children who were being put to bed. In the ensuing search no narcotics were found. But in a bedroom Agent Byram observed ''a postal scale, a small stapling machine, and a roll of scotch tape, and a box of staples, and some loose staples.''

Agent Brewer, who was present at the Rosales residence, testified that he asked the defendant Rosales if he would step into the kitchen so that he could talk to him. Rosales went into the kitchen. As to what then occurred, Agent Brewer testified in part as follows: ''After a few questions, I asked him if he would mind taking everything out of his pockets so I could look at it, and he did, at which time he took out a roll of money out of his left pocket, and it appeared to be quite a substantial amount of money, so I took the money and, with the assistance of Agent Palo, I checked it against our currency

list which I found one bill to be with the same serial number that was on the list.'' The witness then arrested Rosales for the offense of selling heroin. He made a further search of Rosales. The total amount of money he found was approximately $714, of which amount $650 was in bills having serial numbers which had previously been recorded by the Bureau of Narcotic Enforcement. Rosales said a friend had given him the money to hold for him but that he would rather not identify the friend.

Agent Nice asked the defendant Padilla to come into the kitchen so that he could talk to him. Padilla said that he lived in that residence. Agent Nice testified in part as follows: ''And I asked him if he minded if I searched him. And he said, 'No, go ahead.' And I said, 'Well, would you take your jacket off,' and he did. He placed it on the back of the chair. And I looked at his arms and I said, 'Would you put everything in your pockets on the table so I could see it,' and he did. And he removed a billfold . . . and he had $208.00 in the billfold. And I asked him if that was his money. And he said yes. . . . And I said, 'Where did the money come from?' He said, 'Well, I got the money from cashing some checks.' And I reached in the inside right pocket of his jacket that was on the chair and I removed $150.00, all in ten-dollar bills, and I said, 'Is this your money?' And he said, 'Yes, that's part of the money that I got from cashing the checks.' So I checked two of the bills against the previously recorded list, and they matched.'' Later Agents Nice and Brewer checked the money against the recorded serial numbers; they ascertained that serial numbers of bills totaling $650 found on the person of Rosales and of bills totaling $150 found on the person of Padilla were on the list.

With respect to the firearm found at the Rosales residence, Agent Byram testified in part as follows: ''While searching a closet in a cubicle of the front room which leads to the hallway, on the top shelf in the rear I found a man's stocking which contained a Colt .45 automatic and seven rounds of ammunition. . . . The shells were inside the stocking . . . separate from the gun. . . . As I was searching the closet . . . Mrs. Rosales spoke to Manuel in Spanish, which I did not understand, and at that time he turned to me and said, 'I think you'll find a gun up there.' '' When he asked the defendant Rosales whose gun it was, Rosales said, ''I guess you would say it's mine.'' When asked how the gun had become

so corroded,[1] Rosales said that his mother had thrown it out and that it was several days before he had found it. He stated that his attempt to clean it had been unsuccessful. He also said that he had obtained the gun from a friend. Part of Agent Byram's testimony was as follows: "Q. Do these appear to be live ammunition? A. They do. Q. Have you tested this gun to see whether or not it will operate? A. The mechanical slide and functions of the gun seem to be operable. I did not fire it. Q. Is there anything that you found on the gun which would impede the firing? A. No, sir, there is not. It appears to be in firing condition."

The defendant Ortiz did not testify in his own behalf but did testify as a witness for his codefendants. He said that he saw Rosales about 6 p. m. on March 17 when Rosales was visiting at his home. He gave Rosales $800 to "take care of" for him, but he did not inform Rosales as to the source of the money. He never discussed with Rosales any sales of narcotics which he had made.

Upon the application of Ortiz for the appointment of counsel to represent him on this appeal, this court appointed the attorney appearing for the defendants Rosales and Padilla. But it is clear from a review of the record that there is no basis for any meritorious claim of error insofar as the appeal of the defendant Ortiz is concerned. As to each of the charges upon which he was prosecuted, his conviction was amply justified.

A more difficult question is presented with respect to the sufficiency of the evidence to sustain the conviction of Padilla as a participant in the sale which occurred on March 17, 1961. The fact that he was in possession of part of the money which Agent Velasquez had handed to Ortiz earlier in the evening was not, standing alone, sufficient to establish his guilt. (Cf. *People* v. *Barnett*, 118 Cal.App.2d 336, 339 [257 P.2d 1041]; *People* v. *Mateo*, 171 Cal.App.2d 850, 855 [341 P.2d 768].) The circumstance that he lied when he said that he received the money when he cashed some checks, and when he said that he "probably" had the money "a long time," was not, in and of itself, sufficient proof of his participation in the crime. (See *People* v. *Bernstein*, 171 Cal.App.2d 279, 284 [340 P.2d 299].) Agent Velasquez testified that he handed Ortiz

---

[1]Agent Byram, in the course of his testimony, said: "If you will note, the carrier and parts of the gun butt and plate are very deeply scarred as though with acid."

$800 about 7:15 p. m. on March 17. But from an earlier time that evening the house where Rosales and Padilla resided had been under surveillance. Agent Brewer testified that Padilla left the house about 6 p. m., went to a service station (other than the one at which Agent Velasquez found the heroin), stayed there about 10 minutes, and then returned home.

When all of the evidence against Padilla is considered, at most it gives rise to a suspicion that he was connected with the activity of Ortiz. But more than that is required to constitute substantial evidence of guilt. (See *People* v. *Draper,* 69 Cal.App.2d 781, 786 [160 P.2d 80].)

The evidence showed that Rosales received from Ortiz the money in the sum of $800 which Agent Velasquez had handed to Ortiz earlier in the evening on March 17. Rosales told Agent Brewer that a friend had given him the money to hold for him but that he would rather not identify the friend. It is true that the officers found on the premises a postal scale, a small stapling machine, a box of staples and some scotch tape and that scotch tape was used on the container of the heroin sold by Ortiz on March 10 and that scotch tape and staples were used on the containers of the heroin sold on March 13. But as to the heroin sold on March 17, there is a significant absence of evidence of the use of scotch tape or staples with respect to the containers. While, because of the evidence of the association of Ortiz and Rosales, the case against Rosales is stronger than that against Padilla, it cannot be said that the People produced substantial evidence that Rosales was a participant in the sale of March 17, 1961. This determination is not affected by the fact that Agent Byrum testified to the following conversation with Rosales: "I said, 'You know, it kind of makes you look like the big man, doesn't it?' And he said, 'Why?' And I said, 'Well, you got all of the money. You had it all earlier in the evening, didn't you?' And he paused for a moment and then he said, 'Well, yes,' he says, 'I guess that sort of does make me look like the big man.' " That conversation is not sufficient to transform the nature of the evidence against Rosales from strong suspicion into the necessary proof of guilt.

The defendant Rosales asserts that the evidence was insufficient to sustain his conviction for violation of section 12021 of the Penal Code.[2] He apparently contends that the

___

[2]Section 12021 of the Penal Code is in part as follows: ". . . any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or

evidence was not sufficient to show that the gun was in his possession and that it was in a condition to be fired. But there is no merit in that position. Mrs. Rosales testified that the defendant Rosales, her son, lived with her. On the occasion on which the officers entered the house, his wife was putting the children in bed. In his own testimony, Rosales indicated that he considered the house to be his home. Agent Byram testified that the Colt .45 automatic and seven rounds of ammunition were found in a man's "stocking" while he was searching a closet. Possession of an article may be proved circumstantially and it is not necessary to show that the accused was in exclusive possession of the premises. (See *People* v. *Flores,* 155 Cal.App.2d 347, 349 [318 P.2d 65]; *People* v. *Van Valkenburg,* 111 Cal.App.2d 337, 340 [244 P.2d 750].) It is true that the defendant Rosales testified as follows: "Q. Was the gun yours? A. No. Q. Did you make any comments about the gun? A. I was sitting on the stool when this officer Byram, I believe it was, was going up on the shelves in this closet, and my mother said, 'There's a gun in the corner there,' she said, 'the gun that I took from David'—wait a minute— She says, 'There's a gun in the corner that I took from David when he was going, in that certain shelf, on the top shelf of the closet.' A. Did you tell that to the officer then? A. No, the officer— I just told him, 'There's a gun up there.' ... A. He says, 'Who does this gun belong to?' Q. And what did you say? A. I says, 'To me. It belongs to me.' Q. Does it belong to you? A. No. Q. Who does it belong to? A. Well, my mother got it from my sister's husband, and my brother-in-law David. Q. And how long had it been in the house, if you know? A. I learned this later. At the time I had no knowledge of the gun. Since then I have learned that she has had it approximately a year, right before my sister got married." That testimony was corroborated by that of Rosales' mother. But the determination of the credibility of the witnesses and of the inferences to be drawn from the evidence was a matter within the province of the trial judge as the trier of fact. (See *People* v. *Flores, supra,* 155 Cal.App.2d 347, 349.) Since there is substantial evidence to support the conclusion of the trier of fact, this court cannot interfere with the determination that the gun was in the possession of the defendant

country, . . . who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense, . . .''

Rosales. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].)

As has been noted, Agent Byram testified in part as follows: "The mechanical slide and functions of the gun seem to be operable. . . . It appears to be in firing condition." The gun was received in evidence as an exhibit. The evidence was sufficient to sustain the determination of the trier of fact that the gun was a firearm capable of use as such and that possession thereof by the defendant Rosales was within the prohibition of section 12021 of the Penal Code. (See *People* v. *McCloskey,* 76 Cal.App. 227, 230-231 [244 P. 930]; *People* v. *Halcomb,* 172 Cal.App.2d 177, 183 [342 P.2d 2]; *People* v. *DeFalco,* 176 Cal.App.2d 590, 593 [1 Cal.Rptr. 578].) The conviction of the defendant Rosales for violation of that section of the Penal Code must stand unless the finding of the firearm occurred in the course of an unlawful search, a problem which remains for consideration.

In addition to the testimony to which reference has been made hereinbefore, on cross-examination Agent Byrum testified that he spoke with Mrs. Alice Rosales in English when she answered the door. He told her he was an officer and was conducting a narcotic investigation and asked her for permission to enter the house. He further testified as follows: "Q. Now, did you ask Mrs. Rosales whether you could search the premises? A. I did. Q. What did she say? A. She said yes."

The applicable law is that if someone with apparent authority consents to the entry and search, and such entry and search are made in good faith, such action is lawful. (*People* v. *Howard,* 166 Cal.App.2d 638, 651 [334 P.2d 105].) The fact that an officer of the law is the person seeking to search the premises does not, in and of itself, render such consent involuntary. Mrs. Rosales testified that she was not afraid of the four men who came into the house. As stated in *People* v. *Galle,* 153 Cal.App.2d 88 [314 P.2d 58], at page 90: "While there is reason for the view that a request or a demand by an officer for permission to search premises is to some extent coercive, considered alone, it does not render the consent involuntary as having been obtained by coercion."

The question of the existence of permission voluntarily given is one of fact which must be resolved by the trier of fact in the light of all the circumstances. (*People* v. *Cunningham,* 188 Cal.App.2d 606, 609 [10 Cal.Rptr. 604].) In the present case the trial court was warranted in reaching the conclusion that the requisite consent had been given to the

entry of the premises and the search of the closet in which the gun was found. The seizure of the firearm was justified because the circumstances under which it was found were amply sufficient to suggest to a reasonable mind that it was possessed by the defendant Rosales in violation of law. (See *People* v. *Ransome,* 180 Cal.App.2d 140, 146 [4 Cal.Rptr. 347].)

The judgment of conviction of the defendant Ortiz is affirmed. The judgment of conviction of the defendant Padilla and the order denying his motion for a new trial are reversed. The judgment of conviction of the defendant Rosales of the crime of violation of section 11501 of the Health and Safety Code as charged in count III of the information and the order denying his motion for a new trial with respect to that count are reversed. The judgment of conviction of the defendant Rosales of the crime of violation of The Dangerous Weapons' Control Law (Pen. Code, § 12021) as charged in count IV of the information and the order denying his motion for a new trial with respect to that count are affirmed.

Shinn, P. J., and Files, J., concurred.