[Crim. No. 6091. First Dist., Div. One. Aug. 28, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. NORMAN MAXWELL LINKE, Defendant and Appellant.

Paul K. Robertson and James H. Wolpman for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—In an opinion filed April 26, 1968 (Cal.App.) 68 Cal.Rptr. 71, this court affirmed an order admitting defendant to probation after his conviction by the court of possession of marijuana in violation of section 11530 of the Health and Safety Code. His conviction followed the denial of his motion to suppress evidence. Defendant's contention that the evidence used against him was the result of an unlawful search was rejected in the face of testimony that occupants of the residence in which defendant resided had consented to a search of the premises by officers who were seeking a fugitive from justice. The opinion upheld the implied finding of the trial court, on conflicting evidence, that consent was given to the officers' entry and overruled defendant's assertions that the consent was invalid because ''(1) it followed an illegal entry in the premises, (2) it was the result of confusion and intimidation by the police authorities, (3) it was not preceded by advice that the consent could be refused, (4) the prosecution failed to prove that the consenting persons had authority so to do, and (5) the consent in any event did not embrace the right to search a locked inner bathroom without the express consent of the defendant as the occupant of that room.''

■ On June 3, 1968 the United States Supreme Court filed its opinion in *Bumper* v. *North Carolina*, 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788]. In response to defendant's petition for a hearing filed June 5, 1968 in the Supreme Court of this state, that court on June 19, 1968 granted the hearing and remanded the case to this court for reconsideration in the light of the opinion in *Bumper*. The parties were solicited to, and did furnish written comment on the question posed by the order for reconsideration, and the case was resubmitted. For the reasons which follow it is concluded that the principle enunciated in *Bumper* does not, as a matter of law, nullify the consent which was manifested in this case. This court adheres to its opinion previously filed and adopts it, together with this addendum, as the opinion of the court.

In this case, as in *Bumper*, there was no reliance on a search warrant.[1] In *Bumper* one of the officers announced, " 'I have a search warrant to search your house.' " (P. 546 [20 L.Ed.2d, p. 801].) The prosecution did not rely upon any warrant to justify the search, but relied upon the consent of the householder. The questions of the existence and the validity of the warrant were never determined in the state court. In *Bumper*, according to the majority opinion, following the announcement, the householder responded, " 'Go ahead,' " and opened the door.

In this case the testimony has been carefully re-reviewed in the light of *Bumper*. Deputy Sheriff Crossfield, who relayed the report to the investigating officer, testified that he advised Deputy Ganley that there was an outstanding warrant for Kesey, and that information had been received that he might be at the Skyline Boulevard address. He advised the deputies "to check" at the address and ascertain if Kesey was there. He further testified, "I don't remember any exact instructions. I told them to check at the residence and, if possible, to look in the house and see if Ken Kesey was in the house. This would be, of course, with the owner's permission, or the occupant's permission, if other than Kenneth Kesey answered the door." Deputy Ganley confirmed this conversation and added that he and his partner were instructed "to proceed up there, meet another Deputy, and check the house out." He stated that there was no discussion with Crossfield about search warrants, and that he was aware that in the absence of permission

---

[1] At the hearing on the motion to suppress the evidence in this case, the prosecutor stated: "I'll stipulate to limit the matter [to] the matter of consent."

to search a dwelling house it would be necessary to get a search warrant. Deputy Doran also knew the difference between a search warrant and an arrest warrant.

The uniformed deputies approached the house in the manner stated in the original opinion. The confrontation with the defendant, and his immediate withdrawal did not give the officers an opportunity to either assert authority or otherwise explain their presence.[2] The deputies' testimony concerning the confrontation with the women is as follows: A period of time, which Ganley fixed at "less than" or "approximately a minute," and which Doran originally estimated at "no more than half a minute," but acknowledged he "could not be sure of," expired before the women appeared at the door. Meanwhile Ganley, shotgun in hand, had advanced into the threshold, "up on the door jamb," and Doran was to his right a little behind him and outside. Ganley stated, "I would have had to move for somebody to close and lock the door. . . ."

Doran testified "We waited outside the front door, and . . . Mrs. Linke and Mrs. [sic] Robinson, came to the front door. . . . At this time Deputy Ganley informed the two subjects that we had reason to believe Ken Kesey was in the house, and if—we had a warrant for his arrest, and if it would be all right if we checked the house for the subject." On cross-examination he affirmed that Ganley told the ladies who came to the door that they were there looking for Kesey and that they had a warrant for his arrest, and asked them if the officers could come in and check the house for Mr. Kesey.

Ganley testified, "I informed the ladies that we had reason to believe that Kenneth Kesey was there, on the premises, and I, with their permission, would like to search the house. . . ." Ganley denied that he then told them he had a warrant for Mr. Kesey's arrest. He stated it was brought up in the kitchen area during the course of the evening when the occupants acknowledged they knew Mr. Kesey. Ganley was unable to recollect that either he or Doran stated that they had a warrant for Mr. Kesey's arrest while they were at the front door; and he couldn't remember whether he had told any of

[2]The People assert that Linke's actions afforded an implied invitation to enter. This contention, which is alluded to in the original opinion (Cal. App.) 68 Cal.Rptr. 71, is not necessarily determinative because the officers in fact did not rush in after Linke. It does, however, explain their presence on the threshold and removes this case from the sphere of the interdiction of *People* v. *Haven* (1963) 59 Cal.2d 713, 718-719 [31 Cal.Rptr. 47, 381 P.2d 927]. (See (Cal.App.) 68 Cal.Rptr. 71 *op. cit.*)

the people that he did have a warrant for Mr. Kesey before Doran discussed the marijuana.

The women appeared to be acting normally and did not seem to be frightened by the presence of the officers. They were cooperative and did not dispute the officers' search of the house. According to Doran, Mrs. Linke said "Come on in and check." Doran was not sure that the women told the officers Kesey was not there. Ganley testified that they said he was not there, "but if you want to search, go ahead." Neither officer was asked to leave the house.

The officers did not tell the women that they did not have a search warrant. They did not tell them the distinction between a warrant for a person's arrest and a warrant to search the premises, nor did they advise the women that they had a right not to consent to a search of the house, and the right to refuse entry to them. According to both officers the question of a search warrant was not mentioned by any occupant until after the discovery of the contraband and the arrest of those present.

A determined effort was made on cross-examination to show that the officers had affirmatively asserted a right to enter, or that they intended to enter whether or not permission was granted. Doran testified that he did not tell the women that the officers had a right to look in the home for Kesey; and that he did not say, nor did he hear Ganley say, that they had a warrant for Kesey's arrest and that if they were not permitted to enter the officers would break down the door and come in anyway. Ganley's testimony was of similar import, and each insisted that permission had been requested and granted.

The general testimony elicited on the hearing on the motion to suppress from Mrs. Linke and Miss Robinson, who were both then codefendants, is set forth in the original opinion. Miss Robinson, who was the first to arrive at the door after Mrs. Linke, testified that the officers explained that they were there because they had received information that Kesey might be at that house. She acknowledged that the officers asked the three women collectively, while they were in the hallway, whether it was all right if they searched the house for Kesey. She neither objected to nor assented to any search; and she generally confirmed Mrs. Linke's testimony. Mrs. Linke testified that the officers were polite and courteous; that they had requested permission to search, and that it was correct that Ganley said " 'Would it be all right if we checked the house

for Ken Kesey.' '' She testified, ''. . . We asked—we asked them what they were doing here, and they said they were looking for Ken Kesey; that there was a bench warrant out for his arrest—did we know that, and we said yes, we'd heard it on the radio today, and, we asked them why they thought that he would be at our house, and they went on to say that they had information that he was at our premises, and we— well, a little confusion ensued after that, where we, you know, said that there would be no reason for him to be in our house, and why would they think that, and they said they couldn't reveal their sources of information. At that point I asked them if they had a search warrant, and they said that they didn't need a search warrant; that they had a bench warrant for his arrest. . . . Sergeant Ganley . . . was the one who told us they had a bench warrant for Ken Kesey. . . . I asked him if they had a search warrant when they asked again for permission. . . . Sergeant Doran said: 'We don't need a search warrant; we have a bench warrant for his arrest.' ''

In *Bumper* the majority concluded as a matter of law that a search cannot ''be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant.'' (391 U.S. at p. 548 [20 L.Ed.2d at p. 802].) The opinion continues: ''When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all. When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.'' (*Id.*, at pp. 548-550 [20 L.Ed.2d at pp. 802, 803] (fns. omitted.)

If the court in *Bumper* means any reference to any warrant, there can be no effective consent to search in this case, because unquestionably reference was made to the fact that there was a warrant outstanding for the arrest of Kesey. Ref-

erence to the cases upon which the majority rely for the proposition "A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid" (*id.* at p. 549, fn. 14 [20 L.Ed. 2d at p. 802]), reveals that, with one exception, each case, as does *Bumper* itself, involved a search warrant. In the exception, *Gibson* v. *United States* (D.C.Cir. 1945) 149 F.2d 381 [80 App.D.C. 81], an arrest warrant was issued for one Williams whom the officers had observed make a sale of marijuana to an informer. ". . . at 2 o'clock in the morning . . . [the officers] went to . . . the house, seven strong, knocked on the door, and when it was opened by appellant Gibson, the leader of the raiders told Gibson he was an officer, exhibited his badge and said they had a 'warrant.' Gibson stood aside and they entered the ground floor apartment of the house. . . . They did not find Williams, nor did they inquire about him. . . . [They located the owner O'Kelley and asked] if he 'minded if they looked around to see if there was any' [marijuana] and . . . [he] told them to go ahead." (149 F.2d at pp. 382-383.) There was no attempt, as in this case, to explain their mission, nor was any permission for the search requested prior to the illegal entry. (Cf., *People* v. *Haven* (1963) 59 Cal.2d 713, 718-719 [31 Cal.Rptr. 47, 381 P.2d 927].) The court observed that the officers in the use of the term "warrant" were "obviously implying a search warrant—which was untrue." (149 F.2d at p. 383.)[3]

It is concluded that *Bumper* is a marker, inserted along the spectrum evincing various circumstances from consent as a matter of law, through conflicting circumstances, to nonconsent as a matter of law. There is nothing novel in the proposition that "acquiescence to a claim of lawful authority" is not free and voluntary consent to a search otherwise precluded by the provisions of the Fourth Amendment. This principle, as enunciated in *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357], and *Amos* v. *United States* (1921) 255 U.S. 313, 317 [65 L.Ed. 654, 656, 41 S.Ct. 266] was considered in the original opinion. (Cal.App.) 68 Cal.Rptr. 71; see also *People* v. *Burke* (1956) 47 Cal.2d 45, 49 [301 P.2d 241] [overruled on other grounds in *People* v. *Sidener* (1962) 58 Cal.2d 645, 647 [25

---

[3]If Mrs. Linke's testimony were accepted, the situation would be comparable. The denials of Doran and Ganley control, however, and it must be assumed in support of the lower court's order that the officers did not represent that the arrest warrant gave them the right to search the premises.

Cal.Rptr. 697, 375 P.2d 641]].) *Bumper* places the marker by establishing that reference to a search warrant is such a claim of lawful authority that it will as a matter of law preclude reliance on consent or acquiescence thereafter elicited. Does it require or invite moving the marker along the spectrum to the situation in this case where reference has been made to a warrant of arrest? Several considerations suggest that such a conclusion is not necessary or desirable under the circumstances of this case.

The cases cited in *Bumper* for support of the proposition that a prosecutor "has the burden of proving that the consent was, in fact, freely and voluntarily given" (391 U.S. at p. 548, fn. 12 [20 L.Ed2d at p. 802]), recognize that the question of consent is generally one of fact to be resolved by the trial court. In two of the cases the consent was upheld (*Wren* v. *United States* (10th Cir. 1965) 352 F.2d 617, and *Simmons* v. *Bomar* (6th Cir. 1965) 349 F.2d 365); and in a third the appellate court remanded the case for reconsideration of the facts under the proper standard of proof (*Kovach* v. *United States* (6th Cir. 1931) 53 F.2d 639). Therefore, since this case does not involve a representation that the officers had a warrant to search as in *Bumper,* the validity of the circumstances should be examined to determine whether there was "no more than acquiescence to a claim of lawful authority." The testimony refutes the contention that the officers claimed authority to search the home under a warrant, or that they announced that the occupants had no right to resist the search. Nor is there evidence of any direct coercion.

In *Higgins* v. *United States* (D.C.Cir. 1954) 209 F.2d 819 [93 App.D.C. 340], which *Bumper* cites with *Amos, supra,* the court states, "But no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that when police identify themselves as such, search a room, and find contraband in it, the occupant's words or signs of acquiescence in the search, accompanied by denial of guilt, do not show consent; at least in the absence of some extraordinary circumstance, such as ignorance that contraband is present. No such circumstance is shown here." (P. 820.) It is unnecessary to determine whether that case establishes that consent is not free or voluntary as a matter of law if the ensuing search reveals incriminating evidence—a doctrine superficially inconsistent with that which holds that "'A search . . . is not made lawful by what it brings to light. . . .'" (See

391 U.S. at p. 548, fn. 10 [20 L.Ed.2d at p. 802].) One may question a logic which fails to consider that aspect of human nature which leads one person to believe he may bluff or beguile another. The point remains that the occupant's ostensible motive to conceal is an element to be considered. In *People* v. *Campuzano* (1967) 254 Cal.App.2d 52 [61 Cal. Rptr. 695], the search of the defendant's house, with his consent produced no narcotics, but did reveal a scrap of paper, which connected him with a paper sack containing narcotics discovered elsewhere. In sustaining the consent the court included the following comment of the trial judge: " '. . . the defendant knew that he did not have any new narcotics there and knew that it would be to his advantage, or at least probably believed that at the time he told the officers. . . .' " (254 Cal.App.2d at p. 57.) In *People* v. *Chaddock* (1967) 249 Cal.App.2d 483 [57 Cal.Rptr. 582], where the consent search revealed a gun which resulted in defendant's conviction for the offense of possession of a firearm by a former felon, the court noted, "in fact he indicated that he did not even think it was a crime for him to possess the gun." (249 Cal.App.2d at p. 486.) So in this case, the trial court was entitled to infer that the women at the door had nothing to fear from the officers' presence and search for a person whom they knew was not in the house, and that they consented to the search to expedite matters and avoid further argument or a stake-out by the officers. (Cf. *People* v. *Rupar* (1966) 244 Cal.App.2d 292, 298 [53 Cal.Rptr. 70].) In fact if Mr. Linke had been more clever or discreet in his attempts to conceal the contraband the whole affair would have resolved in a matter of minutes.

Another factor in this case is the fact that the officers did not rush in after Mr. Linke. Their inaction is more consistent with a show of restraint and reticence to intrude on the rights of others than it is with a claim of lawful authority to enter. They did not rush into the kitchen to secure consent, but the women came from the kitchen to the door, a reassuring factor in itself. Moreover it is acknowledged that the officers asked permission to search.

In *People* v. *De Leon* (1968) 263 Cal.App.2d 155 [69 Cal.Rptr. 653], the court ruled, "A request for permission to search implies a choice of granting or refusing the request, and does not require a warning that consent might be refused [citations]." (263 Cal.App.2d at p. 156; and see original opinion (Cal.App.) 68 Cal.Rptr. 71.) So here the request,

although coupled with a statement that the person sought was wanted under judicial process, precludes finding such an assertion of lawful authority as would vitiate the ensuing consent as a matter of law.

In his comments on reconsideration defendant suggests that Ganley's statement to the women, ''. . . we [have] reason to believe Ken Kesey [is] in the house,'' was such a claim of lawful authority as to vitiate any subsequent consent. This contention is postulated on the premise that the officer was thereby asserting that he had probable cause to enter and arrest Kesey. Even if that premise be accepted, before it could have the requisite coercive effect on any occupant, it must be presumed that he or she equated the existence of probable cause with the right to enter under a search warrant. This presupposes that the occupant had a knowledge of law which is particularly disclaimed by defendant's countervailing argument that the occupant, without legal knowledge, would equate any mention of a warrant of arrest with a search warrant. The statement relied upon cannot be deemed such a claim of authority or so coercive in effect as to vitiate subsequent consent as a matter of law.

Ritualistic formulas cannot solve all the ills attendant to the enforcement and administration of criminal justice. In fact they may lead to formalistic procedures which will stifle enforcement on the one hand, and sap life blood from the liberties and rights contemplated by constitutional provisions on the other. In the last analysis the people's freedom will be no better than the policemen and magistrates they select. This record permits the conclusion that the officers, the magistrate and the trial judge all have acted with due respect for the constitutional rights of the defendant and his co-residents. He is the victim of a comedy of errors, not of a tragedy in which his rights have been villainously trampled under foot.

On reconsideration the prior opinion of the court is hereby exhumed and, as herein supplemented, adopted as the opinion of the court. That opinion follows:

Defendant has appealed from an order granting him probation following his conviction for possession of marijuana in violation of the provisions of section 11530 of the Health and Safety Code, following a trial by the court. He claims that the contraband, admittedly found in his possession, was discovered only as the result of an illegal search of the premises he occupied jointly with others.

Defendant has attacked, unsuccessfully, the use of the

seized evidence by motion to dismiss the indictment under the provisions of section 995 of the Penal Code, by application for a writ of prohibition to the Court of Appeal (1 Civ. 23679, Division Three) and Supreme Court, by motion to suppress evidence, and also in the trial on the merits, which was held by stipulation on the evidence adduced at the preliminary hearing and at the hearing on the motion to suppress evidence.

He presently asserts that there was no probable cause for the officers, who were armed with a warrant of arrest for a third party, to search the residence of the defendant. The officers had been advised by an unknown informant, who identified herself only as a waitress in a coffee shop, that a fugitive from justice whom they sought might be found at the address which proved to be the defendant's residence. The prosecution does not attempt to justify the search on an attempted execution of the warrant of arrest, but contends that consent was given for a search of the premises. Defendant in turn alleges that any purported consent was invalid because (1) it followed an illegal entry in the premises, (2) it was the result of confusion and intimidation by the police authorities, (3) it was not preceded by advice that the consent could be refused, (4) the prosecution failed to prove that the consenting persons had authority so to do, and (5) the consent in any event did not embrace the right to search a locked inner bathroom without the express consent of the defendant as the occupant of that room.

An examination of the record in the light of the applicable principles of law indicates that there is sufficient evidence to sustain the implied finding of the trial court that there was consent for the search which revealed the inculpatory evidence. The judgment must be affirmed.

*The Facts*

On February 4, 1966, at 4:15 p.m., the San Mateo County Deputy Sheriff Gladysz received a telephone call from a woman who identified herself as a coffee shop waitress in Skylonda. She provided information suggesting that Ken Kesey, a fugitive, might be found at 18000 Skyline Boulevard. Gladysz relayed this intelligence to Deputy Sheriff Crossfield. After ascertaining that there was an outstanding arrest warrant for Kesey, Crossfield dispatched Deputies Ganley and Doran to the Skyline address, with instructions to look through the house, if permitted to do so.

Ganley and Doran met Deputy Schofield, and the three offi-

cers proceeded to 18000 Skyline in two vehicles, arriving at dusk, about 6:10 p.m. Schofield remained in position to observe the rear of the residence. Deputies Ganley and Doran approached the front door. Both were uniformed and armed. Ganley carried a shotgun, held by the stock, in barrel-down position.

Deputy Doran testified, that, after they knocked once, defendant Norman Linke opened the door, saw the officers, and, without comment, disappeared into the house leaving the door open. Thirty seconds later defendant's wife and a Miss Robinson appeared at the door.

Doran stated that during this interval he and Ganley waited outside the front door. Deputy Ganley recalled that he waited on the threshold or in the door frame, and that he would "have had to move for somebody to close and lock the door." Doran probably remained behind him.

Ganley testified that he informed the two ladies that the police believed that the fugitive Kesey might be within the premises. Doran indicated that Ganley told the women he had a warrant for Kesey's arrest. Ganley did not recall so informing the women. Ganley then asked the women for their permission to search the dwelling. Mrs. Linke replied, "Come right ahead." The ladies were friendly and cooperative.

The officers indicated they had never told the women that the arrest warrant gave them the right to search the premises, or that if permission was refused they would enter anyway. The officers did not advise the occupants that they did not have to consent to their entry. Ganley testified that no one asked for a search warrant. Doran did not think that Mrs. Linke denied Kesey was present.

At the hearing on the motion to suppress evidence, the defendant countered with the testimony of his wife and Miss Robinson. They were then codefendants, although the charge against them was subsequently dismissed.

Mrs. Linke stated that about 6 p.m., Mr. Frazer, another occupant of the premises, entered the kitchen and said there were two policemen outside the front door. She encountered the officers one and one-half feet inside the foyer. They informed her that they had a bench warrant for Kesey, who they believed might be in the house. Mrs. Linke asked if they had a search warrant. The deputies responded that they did not need one. Defendant's wife then returned to the kitchen to adjust her stove.

Mrs. Linke said that she told the sheriff's men that Kesey was not on the premises. She also testified that Frazer instructed the deputies not to search without a search warrant. She flatly denied granting permission for a search. She further testified that she never gave any "implied consent."

Miss Robinson testified that Ganley was a foot inside the door, and that Doran was in front of Ganley, when she came to the front door. She stated that prior to Mrs. Linke's arrival the officers asked her, "Who was that guy, and which way did he go?" She responded she did not know. The officers then asked about Kesey, and at about this time, Mrs. Linke arrived at the door with Miss Berkun. She indicated that Mrs. Linke left to attend to her cooking, and some four minutes of dialogue ensued with the police, after which she turned around, and "said something to the effect to heck with it, and left, and they followed" her into the kitchen.

Ganley testified he proceeded into the house accompanied by Miss Robinson. After an unproductive tour of several rooms, he thanked the occupants for permitting the search. Mrs. Linke testified that she observed the deputies in the pantry with Misses Robinson and Berkun. Noticing Ganley's "rifle," she directed him to remove it from the house. She stated that Ganley replied he needed the gun to apprehend a criminal. The conversation then apparently returned to the topic of Kesey's presence, and Mrs. Linke did not indicate she repeated her request. Ganley testified that he was not requested to take his weapon from the house.

Doran testified that accompanied by Mrs. Linke he looked through another part of the house. After opening two doors to closets, he came upon a locked door. Doran knocked twice, and then Mrs. Linke said, "Norman, come on out." Doran heard the toilet flush immediately before defendant emerged from what proved to be a lavatory and walked to the kitchen. The deputy entered the bathroom, where he observed marijuana in the toilet bowl and about an open window. He then closed the door and summoned Ganley.

Miss Adrienne Berkun, a good friend of the Linkes, stated that Doran, after knocking on the bathroom door, asked who was within and demanded that the occupant come out. After defendant announced "It's me," Miss Berkun said, "Norman, come on out." Doran could not recall demanding that the person behind the locked door—whom he thought might be Kesey—come out.

Mrs. Linke offered a new version of the bathroom incident.

She pictured Doran knocking "furiously" on the bathroom door, attempting to pull the door open, and demanding to know who was inside. She admitted telling her husband to come out, but only simultaneously with a like demand by Doran.

After Ganley observed the marijuana found by his partner, the occupants, the Linkes, Misses Robinson and Berkun, and Mr. Frazer, were placed under arrest and advised of their constitutional rights.

 Since the search was made without a search warrant, the burden was on the prosecution to show proper justification. (*People* v. *Shelton* (1964) 60 Cal.2d 740, 744 [36 Cal. Rptr. 433, 388 P.2d 665]; *People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]; *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]; *People* v. *Gorg* (1955) 45 Cal.2d 776, 782 [291 P.2d 469]; *People* v. *Jolke* (1966) 242 Cal.App.2d 132, 147 [51 Cal.Rptr. 171]; *People* v. *White* (1964) 231 Cal.App.2d 82, 87 [41 Cal.Rptr. 604]; *People* v. *Contreras* (1963) 211 Cal. App.2d 641, 645 [27 Cal.Rptr. 619].) "Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances." (*People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852]. *Accord*: *People* v. *Shelton, supra,* at p. 746; *Castaneda* v. *Superior Court* (1963) 59 Cal. 2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641]; *People* v. *Fischer* (1957) 49 Cal.2d 442, 448 [317 P.2d 967]; *People* v. *Gorg, supra,* at p. 782; *People* v. *Dahlke* (1967) 257 Cal.App.2d 82, 87-88 [64 Cal.Rptr. 599]; *People* v. *Campuzano* (1967) 254 Cal.App.2d 52, 56 [61 Cal.Rptr. 695]; *People* v. *Jolke, supra,* at pp. 148-149; *People* v. *La Peluso* (1966) 239 Cal.App.2d 715, 728 [49 Cal.Rptr. 85]; *People* v. *Banks* (1965) 238 Cal.App.2d 43, 45 [47 Cal.Rptr. 499]; *People* v. *Contreras, supra,* at p. 646; *People* v. *Elliott* (1960) 186 Cal. App.2d 178, 182 [8 Cal.Rptr. 795].)

 "Where substantial evidence supports a preliminary finding by the trial court and the implied ultimate finding . . . that a voluntary consent has been given, a reviewing court must accept consent freely given as a fact proven. (*People* v. *Bilderbach,* 62 Cal.2d 757, 762-763 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Jackson,* 191 Cal.App.2d 296, 300

[12 Cal.Rptr. 748])'' (*People* v. *Roberts* (1966) 246 Cal. App.2d 715, 727 [55 Cal.Rptr. 62]. In addition to cases cited, see *People* v. *Carrillo* (1966) 64 Cal.2d 387, 390-391 and 392-393 [50 Cal.Rptr. 185, 412 P.2d 377]; *People* v. *Dahlke, supra,* 257 Cal.App.2d 82, 87; *People* v. *Campuzano, supra,* 254 Cal.App.2d 52, 57; *People* v. *Jolke, supra,* 242 Cal. App.2d 132, 149; *People* v. *La Peluso, supra,* 239 Cal.App. 2d 715, 728; *People* v. *Banks, supra,* 238 Cal.App.2d 43, 45; *People* v. *Sullivan* (1963) 214 Cal.App.2d 404, 410 [29 Cal. Rptr. 515]; *People* v. *Contreras, supra,* 211 Cal.App.2d 641, 645; *People* v. *Ortiz* (1962) 210 Cal.App.2d 489, 498-499 [26 Cal.Rptr. 677]; *People* v. *Kinard* (1962) 210 Cal.App.2d 85, 87 [26 Cal.Rptr. 377]; *People* v. *Rogers* (1962) 207 Cal.App. 2d 254, 259 [24 Cal.Rptr. 324]; *People* v. *Elliott, supra,* 186 Cal.App.2d 178, 182.)

The officers' testimony that the defendant's wife stated ''come right ahead'' sustains the implied finding of the trial court that the search of the premises was conducted with the consent of an occupant of the premises. (See *People* v. *Carrillo, supra,* 64 Cal.2d 387, 393; *People* v. *Davis* (1966) 240 Cal.App.2d 496, 498 [49 Cal.Rptr. 663]; and *People* v. *Sullivan, supra,* 214 Cal.App.2d 404, 410.)

Defendant first contends that the consent so manifested was vitiated by the principle set forth in *People* v. *Haven, supra,* as follows: ''Since the officers' presence in the house was unlawful, they could not rely on defendant's consent to search. Since he was suddenly confronted by five officers who had entered without right or permission, it was equivocal at best whether his apparent consent to being searched was voluntary. The substantial probability that the unlawful entry was essential to securing consent and the inescapable uncertainty whether the consent was voluntary preclude treating the consent as an independent valid basis for the ensuing search of defendant's person. Accordingly, the consent, the search, the finding of the key, and the resulting discovery of the marijuana in the hotel room were all products of the officers' unlawful entry and cannot be relied upon to sustain the judgment. [Citations.] . . . A search and seizure made pursuant to consent secured immediately following an illegal entry or arrest, however, is inextricably bound up with the illegal conduct and cannot be segregated therefrom.'' (59 Cal.2d at pp. 718 and 719. Accord: *People* v. *Di Blasi* (1964) 228 Cal.App.2d 338, 342 [39 Cal.Rptr. 416]; *People* v. *Cedeno* (1963) 218 Cal.App.2d 213, 227 [32 Cal.Rptr. 246]; and see

*People* v. *Shelton, supra,* 60 Cal.2d 740, 745 and 747; *People* v. *La Peluso, supra,* 239 Cal.App.2d 715, 730; and *People* v. *Wilson* (1956) 145 Cal.App.2d 1, 7 [301 P.2d 974].) He asserts that since one of the officers was already within the threshold there was an illegal entry in this case which precluded any subsequent effective consent to the search of the premises.

In the first place the defendant's action in opening the door and retreating into the house could be considered as a prior invitation to enter. In *People* v. *Jolke, supra,* this court ruled, ''The circumstances here justify the trial court's finding that there was an implied invitation to the officers to enter which was imparted by defendant's conduct in leaving the door open and walking back into the room as though to receive and converse with his accusers. (*People* v. *Cove, supra,* 228 Cal.App.2d 466, 470 [39 Cal.Rptr. 535]; *People* v. *Baca* (1961) 198 Cal.App.2d 391, 396 [17 Cal.Rptr. 779]; *People* v. *Smyre* (1958) 164 Cal.App.2d 218, 224 [330 P.2d 489])'' (242 Cal.App.2d at pp. 149-150. See in addition to the cases cited, *People* v. *Contreras, supra,* 211 Cal.App.2d 641, 645-646; *People* v. *Elliott, supra,* 186 Cal.App.2d 178, 182; and *People* v. *Holland* (1957) 148 Cal.App.2d 933, 936 [307 P.2d 703]; but cf. *People* v. *White, supra,* 231 Cal.App.2d 82, 87; and *Banks* v. *Pepersack* (D.Md. 1965) 244 F. Supp. 675, 680.)

In *Haven* the court stated, ''The right to seek interviews with suspects or witnesses at their homes does not include the right to walk in uninvited merely because there is no response to a knock or a ring.'' (59 Cal.2d at p. 717.) Here the officers did not walk in uninvited. At most they stood in the doorway waiting to secure consent, and did not even attempt to take advantage of any invitation to enter that could be implied from the defendant's actions. There was no conduct falling within that of the particular circumstances proscribed in *People* v. *White, supra,* 231 Cal.App.2d 82, which involved a 2 a.m. entry into an apartment bedroom, or brushing by the silent occupant, as in *Banks* v. *Pepersack, supra,* 244 F. Supp. 675.

Defendant attempts to draw an analogy to the principle that ''in order to commit a burglary, it is not necessary that the defendant's whole body enter the building.'' (*People* v. *Massey* (1961) 196 Cal.App.2d 230, 236 [16 Cal.Rptr. 402].) The culprit, however, must have the felonious intent before the entry will sustain the charge. So here, the officers, by word

or deed, must manifest an intent to enter and search regardless of consent, before their actions can be deemed illegal. The evidence here, unlike *Haven,* does not compel such a finding as a matter of law.

Secondly, defendant contends that there was such a show of force that Mrs. Linke's alleged consent must be deemed as a matter of law mere acquiescence compelled by the circumstances, and not a product of her volition. In *People* v. *Michael, supra,* the court noted, "that the appearance of four officers at the door may be a disturbing experience, and that a request to enter made to a distraught or timid woman might under certain circumstances carry with it an implied assertion of authority that the occupant should not be expected to resist." (45 Cal.2d at p. 754. See also *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *Amos* v. *United States* (1921) 255 U.S. 313, 317 [65 L.Ed. 654, 656, 41 S.Ct. 266]; *Cipres* v. *United States* (9th Cir. 1965) 343 F.2d 95, 97-98; *Weed* v. *United States* (10th Cir. 1965) 340 F.2d 827, 829; and see *Lankford* v. *Schmidt* (D.Md. 1965) 240 F.Supp. 550, 557 [revd. *Lankford* v. *Gelston* (1966) 364 F.2d 197].) On the conflicting evidence in this case the question of whether the consent was voluntarily given or whether it was granted in submission to an express or implied assertion of authority was a question of fact to be resolved by the trial court. (*People* v. *Carrillo, supra,* 64 Cal.2d 387, 392-393.) "The fact that an officer of the law is the person seeking to search the premises does not, in and of itself, render such consent involuntary." (*People* v. *Ortiz, supra,* 210 Cal.App.2d 489, 498.)

Defendant further suggests that Mrs. Linke's consent was ineffective because the officers failed to advise her that she had a constitutional right to deny them entry. In *People* v. *Wilson, supra,* this court stated, "While the question of consent is one of fact [citation], it is obvious that a 'permission' granted after a person has been improperly arrested and searched, while he is still in custody, and *without informing him of his legal right to refuse permission,* is not a real or proper consent. The search of the car, under the circumstances, was clearly unreasonable." (145 Cal.App.2d at p. 7; italics added.) In *Wilson,* as distinguished from this case, the consenting party was in custody. Even under those circumstances, the courts have rejected the argument that consent will be ineffective in the absence of a warning to the person addressed of his rights under the Fourth Amendment. (*Peo-*

*ple* v. *Dahlke, supra,* 257 Cal.App.2d 82, 87; *People* v. *Campuzano, supra,* 254 Cal.App.2d 52, 57; *People* v. *Chaddock* (1967) 249 Cal.App.2d 483, 485-486 [57 Cal.Rptr. 582]; *People* v. *Roberts, supra,* 246 Cal.App.2d 715, 728-729; but cf. Kingsley, J. Dissenting *People* v. *Campuzano, supra,* at pp. 59-62.) *Wilson* is limited to the circumstances where the consent is the product of an improper arrest. (See *People* v. *Burch* (1961) 196 Cal.App.2d 754, 757 [17 Cal.Rptr. 102]; and cf. *Castaneda* v. *Superior Court, supra,* 59 Cal.2d 439, 442-443.)

Defendant alleges that the prosecution failed to establish that the officers ''reasonably believed in good faith that [Mrs. Linke or Miss Robinson] had authority to consent'' to their entry and search (see *People* v. *Roberts, supra,* 47 Cal. 2d 374, 377).

The record shows that defendant, after opening the front door left the scene, and that Mrs. Linke and Miss Robinson subsequently came to the door. Mrs. Linke not only purported to authorize the officers' entrance, but also personally guided Officer Doran through the house. Miss Robinson guided Officer Ganley. It was stipulated that the premises were jointly occupied by Mr. and Mrs. Linke, Miss Robinson and Mr. Frazer. The defendant's retreat from the scene, and consequent abdication of authority, when coupled with the foregoing evidence of ostensible and actual authority, furnish circumstances sustaining a finding that the officers reasonably and in good faith believed the women had authority to consent to their entry. (See *People* v. *Smith* (1966) 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Ingle* (1960) 53 Cal.2d 407, 415-416 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Banks, supra,* 238 Cal.App.2d 43, 45; *People* v. *Amado* (1962) 208 Cal.App. 2d 780, 781-782 [25 Cal.Rptr. 539]; *People* v. *Hughes* (1960) 183 Cal.App.2d 107, 113-115 [6 Cal.Rptr. 643]; and *People* v. *Howard* (1958) 166 Cal.App.2d 638, 651 [334 P.2d 105]. Cf. *People* v. *Shelton, supra,* 60 Cal.2d 740, 745-747; *Tompkins* v. *Superior Court, supra,* 59 Cal.2d 65, 68-69; and *People* v. *La Peluso, supra,* 239 Cal.App.2d 715, 729-730.)

Lastly, defendant contends that it was unlawful to search the locked bathroom to which he had retreated, and in which the first evidence of contraband was found. In *People* v. *Shelton, supra,* the court observed, ''Moreover, even if Shelton had voluntarily consented to the search, his consent could not justify the invasion of his joint occupant's privacy that occurred when the officer demanded that the door be opened.

(*Tompkins* v. *Superior Court,* 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113])'' (60 Cal.2d at pp. 745-746.) In *Tompkins, supra,* the opinion contains the following recital, ''A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession. [Citations.]'' (59 Cal.2d at p. 69; and see *People* v. *La Peluso, supra,* 239 Cal.App.2d 715, 729-730.)

The facts show, however, that there was no entry until defendant had vacated the room in question. Under these circumstances the general consent to search the premises would cover the particular room the use of which ostensibly was shared by all the occupants of the premises, including the consenting wife. (See *People* v. *Amado, supra,* 208 Cal.App.2d 780, 782; and *People* v. *Howard, supra,* 166 Cal.App.2d 638, 651.)

The evidence permits the inference that the defendant vacated the bathroom at the request of his wife or Miss Berkun. Defendant, however, insists that this is a case of unwarranted intrusion and demand for entry by the authorities which precludes the evidential use of anything discovered as a result of the occupant's compliance with the improper demand. In *People* v. *Shelton, supra,* the court stated: ''The search cannot be justified on the ground that Victorian voluntarily opened the door and thereby exposed evidence sufficient to justify her arrest and a search incident thereto. . . . There is no room for doubt in the present case, for the officer candidly testified that he demanded that Victorian 'Open the door right now.' When he made that demand he had no reasonable cause to arrest Victorian and no right to order the door opened. Since it was opened by virtue of the wrongful assertion of authority [citations], the officers could not rely on what they then saw to justify Victorian's arrest and the search incident thereto. [Citations.]'' (60 Cal.2d at p. 746.) In this case, however, the officer had secured consent to search for the fugitive. From all appearances the person sought might have been concealed behind the locked door, and the officer was warranted in demanding that the door be unlocked, and that the occupant come out.

It is unnecessary to determine whether one joint occupant of common premises may have such exclusive possession of a portion, that his co-occupant may not enter, or authorize another to enter, upon that part of the premises. (See *People* v. *Frank* (1964) 225 Cal.App.2d 339, 343 [37 Cal.Rptr. 202].)

In a residence with four occupants a bathroom is not usually the exclusive domain of one to the exclusion of the others.

Similar considerations preclude defendant's reliance upon the principle that a joint occupant, or one entitled to the joint possession of premises may not consent to the search of the personal property of a co-occupant. (See *People* v. *Cruz* (1964) 61 Cal.2d 861, 866-867 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Murillo* (1966) 241 Cal.App.2d 173, 176-180 [50 Cal.Rptr. 290]; *Reeves* v. *Warden, Maryland Penitentiary* (4th Cir. 1965) 346 F.2d 915, 924-925; and *Davis* v. *People of State of California* (9th Cir. 1965) 341 F.2d 982, 985, fn. 8.) There is nothing to indicate that defendant was entitled to the exclusive possession of the bathroom for purposes and periods other than those for which it was designed and intended to be privately and exclusively used.

The order admitting the defendant to probation is affirmed.

Molinari, P. J. and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 13, 1968.